# SEYFARTH SHAW

Seyfarth Shaw LLP

Seaport East

Two Seaport Lane, Suite 300

Boston, MA  02210-2028

(617) 946-4800

fax (617) 946-4801

www.seyfarth.com

Writer's direct phone
(617) 946-4987

Writer's e-mail
pbannon@seyfarth.com

August 25, 2017

**VIA ECF**

Hon. David E. Peebles, U.S.M.J.
Federal Building & U.S. Courthouse
P.O. Box 7345
100 S. Clinton St., 10th Floor
Syracuse, NY 13261-7345

> **Re:** **Andreas-Moses, et al. v. Hartford Fire Insurance Company,**
> **Case No. 5:16-cv-1387-BKS-DEP (N.D.N.Y.)**

Dear Judge Peebles:

At the Court's invitation, The Hartford submits this post-hearing brief to aid the Court in reviewing plaintiffs' deposition testimony, as part of the Court's "rigorous analysis" of whether plaintiffs' motion for class certification satisfies the requirements of Rule 23.  *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982).  In order to resolve plaintiffs' motion, the Court must address the following factual issue:

> Were claims-handling employees required to follow protocols and
> procedures that eliminated their discretion and independent judgment?

In Section I, below, we explain why that issue should be decided now.

In Section II, we show -- based not only on The Hartford's evidence but the plaintiffs' own admissions -- that the answer is plainly "No."

## I.    The Court Should Determine Now Whether Claims-Handling Employees Were Required to Follow Protocols and Procedures That Eliminated Their Discretion and Independent Judgment.

In its Opposition to plaintiffs' motion for Rule 23 class certification, The Hartford argued that: (1) the central merits issue in the case is whether a claims-handling employee's primary duty involves the exercise of discretion and independent judgment as to matters of significance; (2) the outcome of that issue depends on the answers to several key questions, including:  How complex were the decisions the employee made?  How much authority did the employee have?  How was the

WASHINGTON, D.C.   SYDNEY   SHANGHAI   SAN FRANCISCO   SACRAMENTO   NEW YORK   MELBOURNE   LOS ANGELES   LONDON   HOUSTON   CHICAGO   BOSTON   ATLANTA



Hon. David E. Peebles, U.S.M.J.
August 25, 2017
Page 2

employee supervised? To what extent did the employee rely on others to make decisions?  Was the employee merely following well-established procedures?; and (3) even among the 10 plaintiffs before the Court, those questions have different answers.  Those differences, The Hartford argued, mean that the claims of the proposed class cannot be resolved based on representative evidence.

In their Reply, plaintiffs claim to have a silver bullet that renders differences in authority level, claim complexity and supervision irrelevant.  All of the employees in their proposed class, plaintiffs argue, "process disability claims utilizing identical, strict protocols and procedures prescribed by Defendant."  Reply at 2.  As a result (according to plaintiffs), employees who "process" disability claims do not exercise discretion and independent judgment regardless of their authority level,[1] the complexity of the claims they handled,[2] or the degree to which they were supervised.[3]

Thus, deciding plaintiffs' motion for Rule 23 class certification requires the Court to decide: Were claims handling employees required to follow protocols and procedures that eliminated their discretion and independent judgment?  If the answer is "Yes," individualized evidence about authority level, claim complexity and supervision would be unnecessary.  But, if the answer is "No," individualized evidence precludes Rule 23 certification.

Even though this question overlaps significantly with the merits of plaintiffs' claims, the Court cannot properly postpone deciding it.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  If the Court were to certify a Rule 23 class without first resolving the issue, The Hartford submits, the Court would be forced to decertify the case, potentially mid-trial, once the need for individualized evidence about authority levels, claim complexity, level of supervision and other topics became clear.  *See Harper v. Gov't Emps. Ins. Co., No. CV-09-2254 (LDW)(GRB)*, 2015 WL 9673810, at *4 (E.D.N.Y. Nov. 16, 2015), *report and recommendation adopted*, 2016 WL 98516 (E.D.N.Y. Jan. 6, 2016) (decertifying Rule 23 class of insurance claims handling employees after six years of litigation).[4]

---

[1] Reply, Dkt. 48 at 9 & n.5 (claiming that, unlike adjusters, analysts have to follow strict protocols and do not have independent judgment, regardless of authority level).

[2] "[A]ll analysts handle claims regardless of what segment they fall within, using the same Hartford policies and procedures. . . ."  Dkt. 48 at 9.

[3] "[L]evel of supervision . . .  should carry little weight in this Court's analysis" because supervisors are merely "monitor[ing] [an] Analyst's demonstrated ability to follow well established policies and procedures put in place by Hartford."  Dkt. 48 at 10.

[4] In asking the Court to certify a class, plaintiffs must do more than identify triable factual issues.  *Compare* Dkt. 48 at 4-5, 9 n.5 (citing denial of The Hartford's summary judgment motion in *Hollinger* case).  They have the burden of proving facts satisfying the requirements of Rule 23, including the predominance requirement of Rule 23(b)(3), by a preponderance of the evidence.  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).  As shown in Section II, below, the evidence overwhelmingly supports The Hartford's position on this issue.



**II.     The Hartford's Policies And Protocols Do Not Eliminate The Need For Claims-Handling Employees To Exercise Discretion And Independent Judgment.**

        A.    <u>General Testimony</u>

In opposition to plaintiffs' Rule 23 motion, The Hartford presented three declarations explaining that Claims Excellence materials were intended to provide guidance to employees and could not be applied in a rote or mechanical way.  (Dkt. 47-3, ¶¶ 4-6; Dkt. 47-4, ¶¶ 19-21; Dkt. 47-5, ¶ 7.)

The plaintiffs who have been deposed corroborate this description.  For example, Elizabeth Wagner testified:

Q. Would you agree with me that in some cases there are more well-defined criteria than in others about whether to take a particular step with respect to a particular claim?

A. Yes.

Q.  For example, there are not as specific a checklist as to whether you should refer a case to medical case management?

A. Yes.

Q.  It's more of a judgment call?

A. The way I described it earlier I think describes it best.  There are times when things are very clear-cut.  For example, somebody referring from surgery or things like that or they have terminal cancer.  But the procedure and policy is if it's beyond that scope, we would have clinical involved.

Q. So you are saying that is checklisted for whether you use some of the resources in some particular cases and sometimes the checklists are better defined than others, but can we agree that you are deciding whether to use particular resources for particular claims?

A. Yes.

Q. Can we agree that the decision is not always obvious?  That you are sometimes having to think hard about, "Gosh, should I take this to medical?  Should I send it to vocational?  Should I call up the claimant?  Should I call the employer?  Should I call the doctor?"  Sometimes, do you have to think hard to make the sufficient next step?

A. That's what roundtables are for, or to a lesser scale, conversation with my supervisor, or in our daily huddles, we may talk about claims situations like that.



Q. So you may get help from roundtable or from your team leader or from a peer, but you have to make those decisions and they are not always obvious.  Can you agree on that?  I mean, if they are obvious, why would you be talking about them at roundtable, right?

A. What to do and what resources to use are not always obvious.  I agree with that.

Wagner Dep. 103:10-105:2.

Joseph Wojcik admitted that his job involved decisions that are "not cut and dr[ied]." Wojcik Dep. 67:5-24.  He also agreed that:  Claims Excellence is a vast collection of materials; probably no human being has read it all; there is no easy place to go where it will just tell you how to handle every claim; and there are going to be claims where it is not clear what to do next.  *Id.* 71:10-73:3-23.

Andreas-Moses acknowledged that she had at least eight different options for where to refer claims she was handling and that deciding what to do with a particular claim required "critical thinking."  Andreas-Moses Dep. 130:9-131:7.  She also testified that her team leaders wanted her to develop a long-term plan for each claim she was handling because claims are handled better and the amount paid on a claim is more accurate when she comes up with a long-term plan.  *Id.* 140:3-19.

Likewise, West agreed that there "are decisions that you as the analyst have to make that are not written down cut and dry on Claims Excellence documents and that you have to make without consulting the team leader at least not right away."  West Dep. 265:16-22.

Cook testified that it was up to her to decide which of at least eight resources to use with a given claim and when to use them.  Cook Dep. 192:6-193:16

Similarly Wright admitted that she had to use her "discretion and independent judgment" to decide which job aids applied to which claims.  Wright Dep. 238:7-239:3.

> B.  Examples Of Departures From Specific Protocols

In addition to these general admissions, several plaintiffs testified to specific examples of how their decisions were not dictated by any protocols or procedures.

For example, while interview scripts were available, plaintiffs chose whether and when to follow them or come up with their own questions.  Cook Dep. 60:22-64:18; Wagner Dep. 193: 7-17; West Dep. 135:12-136:21; 253:13-17; Wright Dep. 192:1-25.

While plaintiffs received periodic reminders to follow up with claimants, it was up to them whether and when actually to do so.  Cook Dep. 90:17-93:6 (Cook changed the timing of follow-up calls with claimants depending on the needs of a claim); West Dep. 268:25-270:2 (West did not conduct check-in calls with claimants if she determined they were unnecessary ,and if she conducted the call, she decided what to ask); Wojcik Dep. 101:18-25 (In addition to the typical three month follow up calls to claimants, Wojcik called them "on an as-needed basis").



While plaintiffs were responsible for ensuring that the restrictions and limitations on a claimant's abilities were documented, it was up to them to decide which medical records were necessary.  Cook Dep. 48:25-49:4, 67:24-10 (Cook decided whether to request any medical records and if so, from which doctors and for what period); Wright Dep. 51:6-24; 72:4-8 (When Wright received medical records about a claimant, she "assess[ed]" them and "determine[d]" whether she needed additional documentation); *Id.* 72:4-73:8 (Wright determined which medical records she needed and sometimes made the decision to call a physician for further information).

While plaintiffs were expected to review the relevant disability insurance policy at the beginning of a claim to determine whether a claimant was eligible for coverage, it was not always obvious how to interpret the policy.  West Dep. 275:3-14 (insurance policies were not always easy to interpret); West Dep. 118:24-120:11 & Ex. 2 (participated in a study with a team working to revise and clarify a client's policy language).

          C.       <u>Plaintiffs' Evidence Falls Short</u>

In their Reply brief, plaintiffs cite general statements about The Hartford's protocols and procedures.  For example, Cook was asked "Did you have to follow protocols and procedures in doing your job?" and answered "Yes."  Cook Dep. 214:11-17.  And, Andreas-Moses submitted an additional declaration stating that she was given a lengthy training manual.  (Dkt. 48-3.)  As explained, above, however, there is no dispute that plaintiffs -- like employees at many levels of many organizations -- were required to follow policies.  This evidence falls far short of showing that plaintiffs were subject to the types of policies that eliminated the need to exercise discretion and independent judgment.

Similarly, plaintiffs' counsel asked several plaintiffs at their depositions whether they could choose to deny a claim if it met the requirements for approval, or approve a claim if it did not.  Naturally, they answered that they could not.  *See, e.g.,* Cook Dep. 213:13-20; Wagner Dep. 215:11-16; Wojcik Dep. 170:19-171:7.  But this line of inquiry skirts the key question:  did plaintiffs use discretion and independent judgment to decide whether a claim met the criteria for approval?  As shown above, by their own admissions they did.

Finally, some plaintiffs tried to suggest in their depositions that they could avoid hard decisions by consulting with Medical Case Managers ("MCMs").  In fact, as Daniel Vinch, a manager of MCMs explained in his declaration, MCMs do not decide whether The Hartford should approve claims; they merely help claims-handling employees determine whether a claimant's stated restrictions and limitations are supported by the claimant's medical records.  (Dkt. 47-5 ¶¶ 6-7, Ex. A.)

Indeed, Wagner testified that she had to decide at what point, if at all, to refer a claim to an MCM and that those decisions were sometimes challenging.  Wagner Dep. 206:4-23.  Wagner also noted that referring a case to medical (or its mental health counterpart, behavioral health) involved preparing a "write up" summarizing the relevant aspects of the claim and that preparing the write ups was not always easy, especially for mental/nervous claims.  *Id.* 73:21-75:3.



More fundamentally, several plaintiffs conceded that even after they obtained guidance from an MCM, whether to approve a claim was still sometimes difficult.  As Wright conceded, it remained her job even if she had obtained medical advice, to determine whether a claimant's restrictions and limitations prevented him or her from performing his or her own occupation or other occupations.  Wright Dep. 53:14-55:17.  Andreas-Moses admitted that she considered but did not always follow guidance from MCMs.  Andreas-Moses Dep. 209:5-25.  West acknowledged that she received a poor quality rating as to a claim precisely because of a failure to question guidance from an MCM.  West Dep. 227:20-237:24 & Ex. 8.

To top it all off, different plaintiffs consulted with MCMs in different ways and to different degrees.  At the most, West sought guidance from the medical department in about half of her claims because she did not want to delay her claims.  West Dep. 277:17-279:15, 283:8-285:21, 295:13-19.  Wojick estimated that he referred 7-8 claims to MCM per month.  Wojcik Dep. 157:3-159:6.  Thus, the plaintiffs' consultations with MCMs cannot rescue their Rule 23 motion.

## III.   Conclusion

Plaintiffs do not deny that they had different authority levels, handled different types of claims, were subject to different levels of supervision and sought assistance from other departments to different extents.  Instead, they argue that these differences will not be relevant to whether they exercised discretion and independent judgment because they all had to follow formulaic procedures.

In fact, no such procedures exist.  The Hartford receives LTD claims from individuals with an endless variety of physical and mental health conditions, working in virtually every type of job.  Its procedures require timely decisions and proper explanations to claimants and its job aids help claims-handling employees benefit from the experience of others.  But, it should come as no surprise that The Hartford has no protocol or procedure that eliminates the need for claims handling employees to use discretion and independent judgment to decide whether and for how long to pay long-term disability benefits to a claimant.

If some or all of plaintiffs deny exercising discretion and independent judgment as to matters of significance, because they claim that they were too closely supervised, had too little authority, handled claims that were too simple, or for any other reason, they will have the opportunity to try to prove those contentions.  But such allegations cannot be proven by representative evidence and therefore cannot support a Rule 23 class.

Respectfully submitted,

SEYFARTH SHAW LLP

Patrick Bannon, Bar No. 520466



Brian J. LaClair, Esq.
David V. Barszcz, Esq.
Mary E. Lytle, Esq.